**UNITED STATES BANKRUPTCY COURT**                **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                             Chapter 13

Chiamu May Lin                                     Case No. 09-16689 (SHL)


                            Debtor.
-----------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

**DOYAGA & SCHAEFER ATTORNEYS AT LAW**
*Attorney for the Debtor*
26 Court Street, Suite 1002
Brooklyn, NY 11242
        By: David J. Doyaga, Esq.


**UNITED STATES ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK**
*Attorneys for the United States of America*
86 Chambers Street, Third Floor
New York, New York 10007
        By: Preet Bharara, Esq.
            Bertrand Madsen, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion to dismiss the above-captioned Chapter 13 case (the

"Motion") (ECF No. 50), filed by the United States of America, on behalf of the Department of

the Treasury, Internal Revenue Service (the "IRS" or "Government"). The Government argues

that debtor Chiamu May Lin's case should be dismissed for cause pursuant to 11 U.S.C. §

1307(c) because Debtor engaged in bad faith conduct, notably lying about the disappearance of

some $1.7 million as part of an effort to avoid paying her IRS debt. More specifically, the

Government argues that the Debtor falsely claims to have paid this $1.7 million as part of an

extortion scheme against her. Debtor opposes the Motion, arguing that she has exhibited good

faith in the case under the totality of the circumstances. As the Court finds the Debtor's

extortion story wholly unbelievable and other aspects of her case problematic, the Court grants

the Motion. This decision constitutes the Court's findings of fact and conclusions of law.

## BACKGROUND

Debtor moved to the United States of America in 1989 to attend college and thereafter

obtained a bachelor's degree from the Pratt Institute. Evidentiary Hearing Transcript, June 26,

2013 ("Hr'g Tr.") (ECF No. 81), at 11:5-12:3. Debtor also obtained two graduate degrees, one

from the Pratt Institute and another from the School of Visual Arts. Debtor is currently self-

employed as a computer graphics designer and developed two patented inventions. *Id.* at 12:25-

13:22.

In 1998, Debtor bought a three-story property located at 436 West 18th Street, New York,

New York (the "Property) for approximately $865,000.00, and assumed the existing mortgage.

*Id.* at 14:4-15:8. On May 9, 2005, Debtor sold the Property for $3.5 million, netting

$2,568,125.49 from the sale. *Id.* at 16:16-17, 18:1-6. As a result of the sale, Debtor incurred

federal income tax liability for 2005 of $303,733.00. *Id.* at 19:17-19. On April 21, 2006, Debtor

paid her New York State taxes in full, but sent the IRS a check for partial payment in the amount

of only $65,600.00. *See* Letter from Neil B. Katz to United States Trustee, dated Sept. 16, 2010,

at 3 (ECF No. 26 at Ex. C, Document 15) ("Katz Letter of Sept. 2010"); *see also* Letter from

Neil B. Katz to United States Trustee, dated Jan. 12, 2011, at 10 (ECF No. 26 at Ex. F,

Document 34) ("Katz Letter of Jan. 2011"). To date, Debtor has not paid the remaining portion

of her 2005 federal income tax liability to the IRS.

### A. The Alleged Extortion

Debtor claims that, right around the time of the Property sale, she was the victim of an

extortion scheme. She contends that, because of the extortion, she could not pay her 2005

federal income taxes. While some of the details of Debtor's account vary, the essential facts of

her story are the same. In the days shortly before and after the Property sale, Debtor allegedly

received two phone calls from an unidentified caller. During the first call, the caller said, "[y]ou

have to give the money to us . . . otherwise your family, your brother . . . will be in trouble."

Hr'g Tr. 22:20-25; Rule 2004 Deposition Transcript, Dec. 1, 2010, at 41:14-19 ("Dep. Tr.")

(ECF No. 26 at Ex. D, Documents 26-29). The caller never specified an amount of money

sought. Hr'g Tr. 25:23-26:7; Dep. Tr. 44:10-12. Debtor stated the caller was female, but she did

not recognize the voice. Dep. Tr. 39:2-6. After the purported first call, Debtor did not attempt to

identify the caller. Hr'g Tr. 27:18-28:11; Dep. Tr. 39:15-40:2. Debtor did not report the alleged

call to anyone, including the police, FBI, IRS, family, or friends because the caller allegedly

requested that she not do so. Hr'g Tr. 27:21-28:15; 41:12-42:7.

Debtor contends that she received a second call around the time of the closing or a few

days thereafter. Dep. Tr. 46:3-47:12. The second caller was also female, but Debtor was not

sure if the voice was the same as the first caller. *Id*. at 48:18-23. The caller directed Debtor to "spread [the money] out to a lot of bank[s]" and "just give us the money as soon as possible" but again did not specify the amount of money. *Id.* at 49:1-7, 21-25.

After the alleged second call, Debtor opened numerous bank accounts and a safety deposit box to spread the money around. Hr'g Tr. 42:21-44:13. Between May 26, 2005, and July 14, 2005, Debtor made over eighty cash withdrawals totaling $1,730,100.00. Hr'g Tr. 44:18-21, 45:25-46:4; *see also* Katz Letter of Jan. 2011, at 21-28 (ECF No. 26 at Ex. F, Document 33). Debtor withdrew this large sum of money, even though the caller had not yet demanded or even discussed a specific sum and even though Debtor believed the caller was unaware of the amount Debtor received from the sale of the Property. Dep. Tr. 86:19-24, 87:13-24. Debtor kept some of the money in the safety deposit box and the remaining cash at her apartment. Dep. Tr. 75:2-19.

Debtor purportedly received a third call in mid-July 2005. Hr'g Tr. 45:18-24. The caller asked Debtor how much cash she had accumulated, to which Debtor responded that she had $1.7 million. Hr'g Tr. 45:25-46:4; Dep. Tr. 59:12-21. The caller told Debtor to meet at a parking lot at the corner of Sixth Avenue and 25th Street in Manhattan to hand over the money. Hr'g Tr. 47:3-5; Dep. Tr. 61:25-64:6. Debtor brought the $1.7 million in cash in three bags to the appointed street corner that same day. Hr'g Tr. 47:6-19; Dep. Tr. 85:18-86:4. Two women drove up in a cab, and one of them exited the taxi and said, "Give me the money." Dep. Tr. 83:12-84:13. Debtor complied and the two women drove away in the cab. Hr'g Tr. 47:23-48:7. Debtor did not recognize either woman. *Id.* at 84:21-85:8. Debtor never reported any of these events to the police, family, or friends.

### B. Debtor's Financial Activity After the Alleged Extortion

Shortly after the alleged extortion payment, Debtor opened two brokerage accounts, where she deposited $347,488.00 between July 21, 2005 and September 30, 2005.[1] Hr'g Tr. 58:6-24, 60:8-61:8. Debtor's brokerage accounts generated proceeds of $795,450.00 in 2005. Declaration of Karen Burke, May 21, 2012 at ¶ 7 ("Burke Decl.") (ECF No. 51); *see also* IRS Returns Processing Transcript ("IRP") for 2005, Burke Decl. Ex. A at 1. In addition, from July 2005 to December 2005, Debtor withdrew over $104,900.00 in cash and paid credit card bills in the amount of $128,000.00. *See* Katz Letter of Jan. 2011, at 4-19 (ECF No. 26 at Ex. F, Document 33); Katz Letter of Sept. 2010, at 3 (ECF No. 26 at Ex. C, Document 15). As Debtor admitted, she went "a little bit crazy" after the sale of her Property on "luxury things" such as spa treatments, luxury hotels, perfume, clothing and gifts for friends. Dep. Tr. 97:4-98:17.

Debtor continued to trade through her two brokerage accounts, generating substantial proceeds: $3,468,553.00 in 2006, $3,090,382.00 in 2007, and $3,374,739.00 in 2008. S*ee* Burke Decl. ¶¶ 8-10; 2006-2008 IRPs, Burke Decl. Exs. B, C, D. In 2009, Debtor opened a new brokerage account with E-Trade Clearing LLC ("E-Trade"), which generated proceeds of $876,641.00. Burke Decl. ¶ 11; 2009 IRPs, Burke Decl. Ex. E.

Despite her lavish spending and trading activity, Debtor maintained that she could not pay her 2005 Taxes. On February 15, 2007, Debtor told the IRS she could not pay her 2005 federal income taxes because she used the proceeds from the sale to pay some debt and some taxes and loaned $1.5 million to a friend whom she could not locate. Burke Decl. ¶ 14. On March 24, 2007, Debtor again contacted the IRS, and reiterated that she had loaned $1.5 million to a friend. *Id*. at ¶ 15. In February 2008, Debtor submitted an amended 2005 federal income

---

[1]    Debtor opened one account with Scottrade with an initial deposit of $100,000 and followed by a second deposit of $50,000. Hr'g Tr. 58:6-24. Debtor also opened a brokerage account with HSBC Securities USA with an initial deposit of $97,488 and followed by an additional deposit of $100,000. Hr'g Tr. 60:8-61:8.

tax return, which included a signed statement summarizing the extortion scheme and stating that she did "'not have any money to pay' her federal income taxes."[2]  Adversary Compl. Ex. B, Amended Income Tax Return at 5 (ECF No. 26, Document 6).  The large IRS tax assessment was the "sole reason" for Debtor's Chapter 7 filing.  Petition, Statement of Financial Affairs ("SOFA") ¶ 10 (ECF No. 1).

### C. Procedural History

On November 9, 2009 (the "Petition Date"), Debtor filed a Chapter 7 voluntary petition. In Debtor's Chapter 7 Petition, she claimed she could not pay her IRS tax liability because she was extorted in the sum of $1.7 million.  *Id.*  Debtor's schedules indicate the IRS held an unsecured priority tax claim in the amount of $344,937.  Petition, Schedule E (ECF No. 1).[3] Debtor's schedules also indicate an unsecured non-priority liability for credit card debt totaling $53,861.  *See* Petition, Schedule F.  Debtor listed assets totaling $8,251.  *See* Petition, Schedule B.

The United States Trustee (the "US Trustee") conducted a Rule 2004 examination of Debtor on December 1, 2010, to uncover information regarding the alleged extortion.  *See* Dep. Tr. (ECF No. 26, Documents 26-29).  On February 7, 2011, the US Trustee commenced an adversary proceeding against the Debtor, objecting to Debtor's discharge pursuant to 11 U.S.C. § 727 for failure to adequately explain her disposition of more than $1.7 million (the "Adversary Proceeding") (Case No. 11-01448).

---

[2]      At the evidentiary hearing, the Government noted that Debtor had over $300,000.00 in her HSBC account on April 18, 2006.  Hr'g Tr. 56:14-16.  This amount was enough to pay her federal income tax in full.

[3]      On February 9, 2012, the IRS filed a proof of claim in this case, asserting a claim for $347,277.36 for unpaid federal income taxes and penalties for the 2005 tax year.  *See* Claims Register, Claim 1-1.

On November 14, 2011, four days prior to the scheduled trial in the Adversary

Proceeding, Debtor filed a motion to convert her Chapter 7 case to a Chapter 13 case. *See*

Motion to Convert (ECF No. 27). The Government informed the Court that it did not object to

the Debtor's motion to convert, "with the understanding that the IRS would not waive any of the

arguments or rights that it had, including the right to maintain objections raised by the United

States Trustee in the Adversary Proceeding, and to object to the confirmation of the Debtor's

Chapter 13 plan." Gov't Letter to Court, dated Dec. 19, 2011 (ECF No. 33). On December 20,

2011, the Court entered an order granting the motion to convert. Order, dated Dec. 21, 2011

(ECF No. 36.)

On May 22, 2012, the Government filed the instant Motion. Debtor filed an opposition to

the Motion on March 29, 2013. Given factual disagreements between the parties, the Court held

an evidentiary hearing on the Motion on June 26, 2013, at which time the Debtor testified and

documents were introduced without objection to supplement the evidence submitted with the

Motion.[4] *See* Hr'g Tr. 4:19-8:15. At the evidentiary hearing, the Court requested that the parties

submit supplemental briefing on two possible grounds for dismissal – whether this case is a two-

party dispute and whether Debtor has caused unreasonable delay prejudicial to her creditors.

Both parties filed briefs addressing the applicability of these two issues in this case. *See* Brief in

Support of Debtor's Opposition to Motion to Dismiss (ECF No. 82); Memorandum of Law in

Further Support of IRS's Motion to Dismiss (ECF No. 85).

---

[4]     The Government introduced Exhibits A through G at the evidentiary hearing. Each of these documents had
previously been filed as exhibits to Karen Burke's Declaration in Support of the Motion (ECF No. 51), and the US
Trustee's Adversary Complaint against Debtor.

## DISCUSSION

### I.    Motion to Dismiss Standard

"One of the primary purposes of the bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit [her] to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'"  *In re Nassoko*, 405 B.R. 515, 522 (Bankr. S.D.N.Y. 2009) (citation omitted); *see also Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)) (noting the "principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor").

Pursuant to Section 1307(c) of the Bankruptcy Code, a court may dismiss a Chapter 13 case for cause, including where there is "unreasonable delay by the debtor that is prejudicial to creditors."  11 U.S.C. § 1307(c).  While Section 1307(c) identifies several circumstances warranting dismissal, that list is not exhaustive.  "Although 11 U.S.C. § 1307(c) does not expressly equate bad faith with 'cause,' the bankruptcy court can also dismiss the petition . . . under § 1307(c) if the debtor files his petition in bad faith."  *In re Eatman*, 182 B.R. 386, 392 (Bankr. S.D.N.Y. 1995) (citations omitted); *see also Plagakis v. Gelberg* (*In re Plagakis*), 2004 U.S. Dist. LEXIS 2458 at *12 (E.D.N.Y. Jan. 27, 2004) (bad faith filing constitutes "cause" for dismissal).

To determine whether a debtor filed her petition in bad faith, the Court must review the totality of the circumstances.  *Eatman*, 182 B.R. at 392.  Dismissal based on lack of good faith is determined on an *ad hoc* basis and only in "egregious cases" entailing concealed or misrepresented assets and/or sources of income, excessive and continued expenditures, lavish lifestyle, and intention to avoid singular debts incurred through fraud, misconduct, or gross

negligence. *In re Blumenberg*, 263 B.R. 704, 712 (Bankr. E.D.N.Y. 2001); In *re Zick*, 931 F.2d 1124, 1129 (6th Cir. 1991). "Bankruptcy courts routinely allow for dismissal of proceedings when pre-petition bad faith conduct is present, as courts treat such conduct as 'for cause.'" *In re Ramos*, 2009 Bankr. LEXIS 1086 at *4 (Bankr. S.D.N.Y. May 14, 2009). Further, determination of bad faith is a "highly factual determination" that may also "sweep broadly." *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1312 (2d Cir. 1997). Courts have looked to a variety of factors when considering bad faith. Those factors include: whether the debtor was forthcoming with the court, whether the debtor accurately stated facts, debts, and expenses, whether the debtor misled the court through fraudulent misrepresentation, how the debtor's actions affect creditors, and whether the debtor has abused the purpose of the bankruptcy code. *In re Klevorn*, 181 B.R. 8, 11 (Bankr. N.D.N.Y. 1995).

Courts have routinely held that dishonesty of a debtor is an indication of bad faith conduct and warrants dismissal. *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *see also In re Leavitt*, 171 F.3d 1219 (9th Cir. 1999) (holding bad faith of dishonest debtor, who failed to disclose assets, warranted dismissal); *In re Powers*, 135 B.R. 980, 992 (Bankr. C.D. Cal. 1991) (noting "lack of an honest and genuine desire to use the statutory process to effect a plan of reorganization" is an indicia of bad faith).

## II.    Debtor's Case Should be Dismissed For Cause

The Court finds ample basis to dismiss the case for cause. Debtor has not been forthcoming with the Court about her assets. She also appears to have filed this bankruptcy case as a way to avoid paying a single creditor, the IRS. Based on the totality of the circumstances as discussed in detail below, the Court finds cause to dismiss Debtor's case.

First and foremost, the Debtor's claim of extortion rings false, and her dishonesty in this regard is grounds for dismissal.  Notably, Debtor did not report or otherwise mention the alleged extortion to anyone until 2008.  She did not report it to the police, her accountant, her family or friends.  She first disclosed the alleged extortion to the IRS in her amended 2005 tax return, which she filed in February of 2008.  Hr'g Tr. 54:20-55:1.  It seems highly unlikely that, as a victim of extortion, she would only first report it several years later.  Debtor explained that she was afraid to report the extortion at first, but offers no reason why she felt comfortable revealing it later.

Moreover, Debtor's story has changed over the years.  Debtor did not mention any purported extortion prior to 2007.  Then, in two phone calls to the IRS in 2007, Debtor claimed that she had loaned $1.5 million to a friend.  Finally, in February 2008, Debtor filed an amended 2005 tax return where she attributed the loss of $1.5 million for the first time to the alleged extortion.  Amended Income Tax Return, at 5 (ECF No. 26 at Ex. B, Document 6); Hr'g Tr. 54:20-55:1.

Other inconsistencies undermine Debtor's credibility here.  Debtor referred to the alleged extortionist as a male in her Chapter 7 petition and at the Section 341 meeting, *see* Hr'g Tr. 49:17-23, 50:21-51:3, but as a female in subsequent papers and hearing testimony.  Hr'g Tr. 49:21-23.  Debtor also changed the amount, first claiming she gave the extortionist $1.5 million and later alleging it was $1.7 million.  Hr'g Tr. 51:12-52:10.

The Debtor is an accomplished individual.  She holds two master's degrees, developed two patented inventions, and has earned several million dollars through her real estate and brokerage activities.  It is implausible that such a sophisticated individual would voluntarily inform her alleged extortionist that she had $1.7 million in cash available, rather than seek to pay

a lower amount when she believed the extortionist did not know how much she had received for the sale of the Property. It is also unbelievable that Debtor did not attempt to identify her alleged extortionist or tell the authorities of the purported extortion, especially if the extortionist had threatened her family's safety. The implausibility of her story was only further undermined by her wholly unpersuasive demeanor during her cross examination at the evidentiary hearing.

Taken as a whole, Debtor's story is inconsistent and simply implausible. Her dishonesty constitutes bad faith and warrants dismissal for cause.

In addition, dismissal is warranted because the Debtor's bankruptcy case is a two-party dispute. Debtor has taken steps to pay off all of her other creditors, leaving the IRS as the sole creditor in this case. Bankruptcy courts have found that bad faith exists where the "Debtor's reorganization essentially involves the resolution of a two-party dispute." *In re Fonke*, 310 B.R. 809, 817 (Bankr. S.D. Tex. 2004); *see also In re Klevorn*, 181 B.R. at 11. In such cases, the debtor's bad faith was apparent from a filing motivated by or targeted at one sole creditor. The court in *Fonke* found that the debtor in that case abused "the provisions, purposes, and spirit of Chapter 13" and that the debtor's bad faith was cause to convert the Debtor's case to Chapter 7. *Fonke*, 310 B.R. at 818; *see also In re Aichler*, 182 B.R. 19, 21-22 (Bankr. S.D. Tex. 1995).

Here, the IRS contends, and there is ample evidence to support, that the Debtor took steps to isolate the IRS as her only creditor. Shortly after the alleged extortion, she deposited almost $350,000.00 into brokerage accounts, from which she generated over $3 million in proceeds each year from 2006 to 2008. She also generated almost $800,000.00 in proceeds in 2009. During this time, she incurred substantial credit card debt, which she paid off while leaving the IRS debt untouched. Indeed, her petition concedes that her IRS debt is the sole reason for her bankruptcy.

Finally, cause for dismissal exists because Debtor has caused unreasonable delay that is prejudicial to her sole creditor, the IRS. Debtor first filed her Chapter 7 bankruptcy petition almost four years ago. In the two years since converting to a Chapter 13 case, she has failed to confirm a plan. *See* 11 U.S.C. § 1307(c)(1) (a court may dismiss a case where there is "unreasonable delay by the debtor that is prejudicial to creditors"). In fact, Debtor's third amended plan does not appear feasible. As Debtor explained in a letter to the Court, she intends to pay $126,000.00 under the current proposed Chapter 13 plan, and then file another Chapter 13 petition to pay the additional $150,000.00 in priority tax debt under a second 60-month plan. *See* Letter of David J. Doyaga, Sr. to Court, dated June 21, 2013 (ECF No. 77). Under the Debtor's proposal, the IRS claim would be outstanding until at least 2022, thirteen years after the case was first filed and seventeen years after her federal income tax was due. Moreover, the Debtor's proposed plan in this case would not pay off her priority tax debt to the IRS. But pursuant to Section 1322(a)(2), a Chapter 13 plan must pay priority claims in full unless the priority creditor agrees to different treatment of its claim. As evidenced by its Motion, the IRS has not agreed to such treatment, and therefore Debtor's current plan cannot be confirmed.

The Debtor opposes the dismissal, arguing that she has exhibited good faith when one focuses solely on the bankruptcy case itself. In fact, some courts have expressed concern about a bad faith dismissal based solely on pre-petition conduct. *See In re Keach*, 243 B.R. 851, 868 (1st Cir. BAP 2000). But as other courts have noted, such pre-petition conduct can be relevant to a debtor's motivation and sincerity in filing for bankruptcy relief. *See In re Virden*, 279 B.R. 401, 409 (Bankr. D. Mass. 2002) ("The bottom line is whether a debtor is attempting to thwart [her] creditors, or making an honest effort to repay them to the best of [her] ability."). The Debtor's failure here to be truthful regarding her assets is prejudicial to creditors, who rely on

12

transparency in bankruptcy proceedings to determine how best to protect their rights. *See In re Ramos*, No. 09-10858, 2009 WL 2913445 at *2 (Bankr. S.D.N.Y. May 14, 2009) (noting that the debtor's failure to disclose the existence of assets was an abuse of the bankruptcy process); *Marrama*, 549 U.S. at 371(finding bad faith where, *inter alia*, debtor failed to disclose information about assets, including transfer of property prior to filing petition).[5]

Debtor's lack of transparency regarding her financial situation distinguishes Ms. Lin from the honest but unfortunate debtor who may have suffered serious economic setbacks prior to bankruptcy. *See Virden,* 279 B.R. at 408 (noting that courts' totality of circumstances test focuses on, *inter alia,* "the debtor's honesty in the bankruptcy process, including whether [s]he has attempted to mislead the court and whether [s]he has made any misrepresentations.") (citing *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987), among other cases); *cf. In re Park*, 492 B.R. 668, 681-82 (Bankr. S.D.N.Y. 2013) (noting Bankruptcy Code's policy in favor of a fresh start in rejecting claim that large gambling debt was non-dischargeable); *In re Wright,* 191 B.R. 291, 294 (S.D.N.Y. 1995) (affirming the Bankruptcy Court's determination that the Debtor's tax debts were non-dischargeable by noting debtor's failure to pay taxes was not the result of dishonesty but rather a defining characteristic of all debtors – honest and dishonest alike – insufficient resources to pay all obligations) (citing *In re Haas,* 48 F.3d 1153 (11th Cir. 1995).

---

[5]    Both the *Ramos* and *Marrama* cases addressed a motion to convert a case from Chapter 7 to Chapter 13, which can be challenged on the basis of bad faith. *See In re Kerivan*, No. 09-14581, 2010 WL 2472674 at *2 (Bankr. S.D.N.Y. June 15, 2010) (discussing requirements of conversion under § 1307(c)); *In re Ramos*, 2009 WL 2913445 at *2.

## CONCLUSION

For the reasons discussed above, the Court dismisses the Debtor's Chapter 13 case based

on the totality of the circumstances under 11 U.S.C. § 1307(c).


Date:    New York, New York
            October 18, 2013


                                                    */s/ Sean H. Lane*                              
                                                    UNITED STATES BANKRUPTCY JUDGE